UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MOLORI ENERGY, INC., | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | |
| | § | |
| RICHARD SANDS, ADAM SANDS, | § | CIVIL ACTION NO. 3:20-CV-02865-C |
| WILLIAM POON, YARON BENCHLOUCH, | § | |
| CORY MEADOWS, CASIMIR CAPITAL, L.P., | § | |
| RNP LLC, LRG ENERGY LLC, AND | § | |
| PONDEROSA TX OPERATING, LLC, | § | |
| | § | |
| DEFENDANTS. | § | |

FIRST AMENDED COMPLAINT

JOHNSTON CLEM GIFFORD PLLC

**Kenneth C. Johnston**
State Bar No. 00792608
kjohnston@johnstonclem.com

**Robert W. Gifford**
State Bar No. 24093543
rgifford@johnstonclem.com

**Catherine E. (Kate) Gaither**
State Bar No. 24059793
kgaither@johnstonclem.com

1717 Main Street, Suite 3000
Dallas, Texas 75201
(214) 974-8000 Main
(972) 474-1750 Facsimile

*Attorneys for Molori Energy, Inc.*

TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

PARTIES ...................................................................................................................... 4

JURISDICTION & VENUE .............................................................................................. 6

FACTUAL BACKGROUND .............................................................................................. 8

    A.    DEFENDANTS' PONZI-LIKE SCHEME ................................................. 8

    B.    DEFENDANTS' CORPORATE STRUCTURE AND RELATIONSHIPS ............ 9

    C.    THE "2016 LEASES": DEFENDANTS CONVINCED MOLORI TO PURCHASE OIL AND GAS INTERESTS BASED ON FALSE INFORMATION. ......................................................................... 10

        *Spring 2016: Defendants Promoted Oil and Gas Investments to Molori Based on False Pretenses.* ................................................. 10

        *May 2016: Molori Invests $1.5 Million in the State Leases.* ........... 11

        *Richard Sands and Ponderosa Energy Did Not Own the State Leases When They Sold the Interests under the First 25% Conveyance to Molori.* ......... 12

    D.    RICHARD SANDS LEECHES MOLORI'S OPERATING CONTRIBUTIONS TO MAKE SELF-DEALING DISTRIBUTIONS. ........................................... 13

        *Overview of Joint Operating Agreements, Working Interests, and Net Revenue Interests* ....................................................... 13

        *2016 Operations: PTO Operates the Oil Leases—But Diverts Molori's Working Interest Investment to Casimir For Richard Sands' Benefit.* ........ 15

        *Sands Conceals His Fraud and Theft from Molori By Controlling PTO's Accounting Records.* ................................................. 17

    E.    RICHARD SANDS DISGUISES THE PONZI SCHEME WITH AN ATTRACTIVE OFFER TO SELL MOLORI A 25% WORKING INTEREST IN THE GS LEASES. ............................................................. 20

        *Spring 2017: Richard Sands and Adam Sands Sell Molori $1 Million Of Interests in the "GS Leases" As Part Of Their Purported Overall Development Strategy.* ....................................................... 20

        *Again, Richard Sands Did Not Own the Working Interests He Sold Molori; He Had Previously Leveraged Them in Exchange for $2.1 Million in VPP Financing.* ............................................................. 22

        *Richard Sands Leveraged Most of the 2016 Leases for an Additional $2.5 Million in VPP Financing and Transferred the State and Thompson Leases out of Ponderosa Energy* ................................................. 23

    F.    SUMMER 2017: MOLORI CONTRIBUTES $100,000 TO WORK OVER THE THOMPSON #23 WELL—WHICH RICHARD SANDS STEALS. ........ 24

G.  RICHARD SANDS PERJURES HIMSELF IN ORDER TO BORROW $5.0 MILLION USING MOLORI'S INTERESTS AS COLLATERAL. .............................25

*Richard Sands' Legal Problem:  A Texas State Court Impedes His Schemes.*............................26

*Richard Sands' Illegal Solution:  Lie Under Oath.* ...................................................27

H.  RICHARD SANDS DEFRAUDS MOLORI INTO "TRADING" ITS ASSETS .........................29

I.  PONDEROSA ENERGY FRAUDULENTLY TRANSFERS THE STATE AND THOMPSON LEASES TO AN INSIDER AND MISLEADS A BANKRUPTCY COURT. ..................................................................................................30

J.  RICHARD SANDS USES MOLORI'S INVESTMENT AND REVENUE TO PURCHASE LEGACY RESERVES, LP ..................................................................32

K.  RICHARD SANDS DEFRAUDED MOLORI WITH THE AID OF HIS CO-CONSPIRATORS. ...........................................................................................33

*Richard Sands*......................................................................................................33

*Adam Sands*........................................................................................................34

*William Poon* .....................................................................................................34

*Yaron Benchlouch*...............................................................................................35

*Cory Meadows* ....................................................................................................35

*Casimir Capital, L.P.*............................................................................................35

*RNP*   ................................................................................................................36

*LRG*   ................................................................................................................36

L.  THE DAMAGE DONE ...................................................................................36

CLAIMS ...........................................................................................................................37

170072v1

Molori Energy, Inc., seeks to recover damages in the amount of at least $6,690,639.49 for fraud, conspiracy, breach of fiduciary duty and securities violations, among other things, in connection with the purchase and sale of oil and gas interests, as well as operations relating to those investments.

## INTRODUCTION

**A.    OVERVIEW OF CLAIMS**

1.      The Defendants perpetuated a massive fraudulent scheme against Molori when they offered and sold oil and gas securities without actually owning the underlying properties and by misrepresenting the nature of the investments.

2.      But in the most basic terms, this is a case about the Defendants who took Molori's money but provided nothing in return. Molori entered into contracts with companies owned and operated by Richard Sands, which accepted funds from Molori with the promise of oil and gas interests in return.  Those interests—and the profits generated by those investments—were never delivered.

3.      One Defendant—Ponderosa TX Operating, LLC f/k/a Ponderosa Operating, LLC ("PTO")—owes a legal and contractual fiduciary duty to hold in trust money that Molori invested, as well as money Molori earned on those investments.  Instead, with the aid of the remaining Defendants, PTO absconded Molori's money through a web of Sands family-owned shell companies. This ensured that  Molori never again saw its investment funds or the expected oil and gas interest—not to mention the millions in profits owed to Molori.

4.      Through this lawsuit, Molori seeks to recover its investments,  profits, and exemplary damages from Defendants by asserting claims of money had and received, breach of contract, breach of fiduciary duty, aiding and abetting, fraud, and securities law violations.  Molori also seeks a constructive trust on and conveyance of title to the property that the Defendants acquired using the funds they looted from Molori.

B.    **SUMMARY OF THE SCHEME**

5.      Molori is a Canadian oil and gas development company.

6.      As detailed below, Richard Sands, his co-conspirators, and his aiders defrauded Molori into investing in Texas oil and gas properties that Defendants either did not own, did not deliver, or vastly misrepresented.

7.      Like so many other Ponzi-esque schemes, part of Defendants' strategy included promises to Molori about attractive returns based on lies about the material facts. But Defendants did not just lie to Molori about the *quality* of the offered oil and gas properties; Defendants lied that they *owned the properties they proposed to sell* to Molori in the first place.

8.      Molori ultimately contributed more than $2.6 million dollars to Sands' scheme, beginning in 2016.

9.      Sands and his companies breached contractual fiduciary duties to Molori and stole Molori's investment dollars through a shell game of inter-company transfers. Defendants funneled Molori's investments and the earned oil and gas revenue through companies that Richard Sands owned and operated. Those companies included defendants Casimir, RNP, and LRG, as well as other companies that have since filed for bankruptcy protection, including Ponderosa Energy LLC ("Ponderosa Energy"), Ponderosa State Energy LLC ("PSE") and GS Energy LLC ("GS Energy").

10.     Defendants also stole Molori's share of the oil and gas revenue generated from the oil and gas properties that it had purchased. Since November 2016, the relevant oil and gas leases have generated *millions of dollars* in oil and gas sales. During this time period, Molori owned a 25% working interest, burdened with operating costs, as well as a 25% net revenue interest, equivalent to a burden-free 25% royalty paid out of gross revenue—which later increased to a 50% working interest with the same 25% net revenue interest. Defendants inexcusably paid Molori just a single payment of $37,000 for that whole time, when Molori was entitled to millions.

11.     Sands, his co-conspirators, and his aiders raced to keep ahead of Molori so the scheme would not collapse. Having already misappropriated Molori's investment funds and siphoned off its production revenue, Defendants next decided to borrow millions more dollars using Molori's assets as collateral.

12.     Defendants perpetuated their scheme in the following ways:

    a.     Sands lied to the Texas State district court for Hutchinson County to get its permission to pledge Molori's oil and gas interests as collateral for a bank loan. Sands falsely testified under oath that his companies were sole owners of those properties.[1]

    b.     Sands lied to Washington Federal bank that his companies solely owned the oil and gas interests pledged as collateral for a multi-million dollar loan.

    c.     Defendants made misrepresentations to the United States Bankruptcy Court for the Southern District of New York when they petitioned for bankruptcy relief but self-servingly failed to disclose pre-petition inter-company transfers of the specific oil and gas properties in which Molori had bought interests along with the debtor entity—thus evading the court's jurisdiction to administer assets for affected creditors.

    d.     Defendants so repeatedly obscured their financial dealings from the Texas state court that it ultimately appointed a special master over all daily operations for Defendants' (and Molori's) oil and gas properties.

13.     Defendants aided and abetted each other throughout these events to extend the scheme. They hoped Molori would tire of chasing them for what Molori bought in the first place.

14.     Molori now asks this Court to help it recover the millions of dollars that Sands, his co-conspirators, and his aiders illegally took, plus unpaid revenue related to the investments. Molori also asks for exemplary damages and its reasonable attorneys' fees and costs.

---

[1] Sands' false testimony to the Hutchinson County court is the subject of a pending contempt proceeding. The Hutchinson County action is stayed by operation of law for unrelated reasons.

## PARTIES

15.    Molori is a foreign corporation organized and existing under the laws of Canada with its principal place of business in Vancouver, British Columbia. Pursuant to 28 U.S.C. § 1332(c), Molori is a citizen of Canada.

16.    Richard Sands is an individual resident and citizen of the State of New York. He may be served with process at 641 Lexington Avenue, Floor 21, New York, New York 10022 or at such other place as he may be found.

17.    Adam Sands is an individual resident and citizen of the State of New Jersey. He may be served with process at 70 Donnybrook Drive, Demarest, New Jersey 07627 or at such other place as he may be found.

18.    William Poon is an individual resident and citizen of the State of New Jersey. He may be served with process at 11 Liberty Lane, Somerset, New Jersey 08873 or at such other place as he may be found.

19.    Yaron Benchlouch is an individual resident and citizen of the State of New York. He may be served with process at 19 Steven Lane, Kings Point, New York 11024 or at such other place as he may be found.

20.    Cory Meadows is an individual resident and citizen of the State of Texas. He may be served with process at 106 Brandon Drive, Borger, Texas 79007 or at such other place as he may be found.

21.    Casimir Capital, L.P. ("Casimir") is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business in Greenwich, Connecticut. It may be served with process at 15 Valley Drive, Greenwich, Connecticut 06831, by serving its registered agent, Corporate Creations Network, Inc., 3411 Silverside Road, Suite 104, Tatnall Building, Wilmington, DE 19810. Casimir consists of the following partners:

a.  RFS, LLC ("RFS"), a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York.  Upon information and belief, Richard F. Sands, a New York citizen and resident as described above, is the sole member of RFS.

b.  Casimir BD Holdings, LLC ("CBDH"), a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York. Upon information obtained from FINRA records, the members of Casimir BD Holdings, LLC are:

(i)  Richard F. Sands 1999 Family Trust.  On information and belief, Phylise Marcy Sands, a New York citizen and resident (as described below), is the trustee.

(ii)  Casimir Capital Group, LLC, a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York.  Casimir Capital Group LLC consists of two members:

(a)  Richard F. Sands 1999 Family Trust, whose citizenship is described above; and

(b)  RNP, LLC, whose citizenship is described below.

22.  RNP, LLC ("RNP") is a limited liability company organized and existing under the laws of the State of Delaware. Upon information and belief, RNP's principal place of business is in New York, New York. RNP may be served with process by serving its registered agent, Corporate Creations Network, Inc., 3411 Silverside Road, Suite 104, Tatnall Building, Wilmington, DE 19810. Upon information and belief, the members of RNP are Richard F. Sands and his wife, Phylise Marcy Sands, both of whom may be served with process at 641 Lexington Avenue, Floor 21, New York, New York 10022 or at such other place as they may be found.

23.  LRG Energy LLC ("LRG") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York but is registered to do business in Texas. LRG may be served with process by serving its registered agent in Texas, Corporate Creations Network, Inc., 5444 Westheimer Road, Suite 1000, Houston, Texas 77056. Richard F. Sands, a New York citizen and resident, is the sole member and manager of LRG.

24.     Ponderosa TX Operating, LLC f/k/a Ponderosa Operating, LLC ("PTO") is a Texas limited liability company with its principal place of business in Houston, Texas. PTO may be served with process by serving its registered agent, Corporate Creations Network, Inc., 5444 Westheimer Road, Suite 1000, Houston, Texas 77056. Richard F. Sands is the sole member and manager of PTO.

## JURISDICTION & VENUE

25.     This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between a foreign plaintiff and domestic defendants.

26.     Molori obtained information regarding the citizenship of the defendants identified herein from its review of Delaware, New York, and Texas secretary of state records, FINRA records, Westlaw records, and PACER records, but cannot conclusively identify all members of CBDH, RFS, or RNP to conclusively determine their respective citizenship. Molori has found no information suggesting that the members of CBDH, RFS, or RNP are citizens of Canada or have members who are citizens of Canada. Based on its diligent research, Molori believes complete diversity exists between the parties.[2] If contested by the Defendants, Molori requests immediate jurisdictional discovery to determine the members of CBDH, RFS, and RNP and the citizenship of those members.[3]

---

[2] *See Bates Energy Oil & Gas, LLC v. Complete Oil Field Services, LLC*, CV SA-17-CA-808-XR, 2017 WL 8727480, at *2 (W.D. Tex. Aug. 30, 2017) (authorizing pleader to "allege complete diversity in good faith on information and belief" once pleader investigated the citizenship of a limited liability company party and had "no reason to believe any of [its] members share[d]" pleader's citizenship); *see also Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 108 (3d Cir. 2015) ("[B]efore alleging that none of an unincorporated association's members are citizens of a particular state, a plaintiff should consult the sources at its disposal, including court filings and other public records. If, after this inquiry, the plaintiff has no reason to believe that any of the association's members share its state of citizenship, it may allege complete diversity in good faith.").

[3] *See Murchison Capital Partners, L.P. v. Nuance Communications, Inc.*, 3:12-CV-4746-L, 2013 WL 3328694, at *4 (N.D. Tex. July 2, 2013) (allowing removing defendant to take expedited jurisdictional discovery to confirm identity of plaintiff limited liability company's members when membership information was not publicly available); *see also Sourcing Mgmt., Inc. v. Simclar, Inc.*, 3:14-CV-2552-L, 2015 WL 2212344, at *5 (N.D. Tex. May 12, 2015) (dismissing suit against defendant limited liability companies when plaintiff failed to identify each companies' members only after giving plaintiff "an opportunity to cure jurisdictional defects" and faulting plaintiff for not "seek[ing] an extension of time to obtain necessary information or request jurisdictional discovery").

27.     This court has personal jurisdiction over each foreign defendant because those defendants each conduct business in the State of Texas[4] and maintain minimum contacts with the State of Texas by: (a) purposefully availing itself of the privilege of conducting activities within the State of Texas; and (b) invoking the benefits and protections of Texas laws.[5]

28.     General jurisdiction exists as to Richard Sands because he has had numerous and systematic contacts with the State of Texas through the numerous businesses that he owns and operates that are located in Texas and owns real and personal property located in the State of Texas.

29.     Specific jurisdiction exists as to Richard Sands, LRG, and RNP because each of those parties: (a) took assignment of real property located in Texas and thereby reached out and created a continuous relationship with Texas; (b) derived income from the Texas; and (c) participated in the operation of oil and gas leases located in Texas. This action concerns those specific contacts.[6]

30.     Further, LRG is registered to conduct business in Texas and maintains a registered agent in Texas.

31.     Specific jurisdiction exists as to Casimir, Poon, Benchlouch, and Adam Sands because each of those Defendants conducts business in Texas by: (a) marketing and selling real property located in Texas; (b) deriving income from the state; and (c) participating in the operation of oil and gas leases located in Texas through the transfer of funds, among other things. This action concerns those specific contacts.

32.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the real property at issue in this lawsuit is located in this district and a substantial part of the events giving rise to the claims occurred in this district.

---

[4] Civ. Prac. & Rem. §17.042.

[5] *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009) (citing *Hanson v. Denckla,* 357 U.S. 235, 253 (1958) and *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 319 (1945)).

[6] *Id.*

## FACTUAL BACKGROUND

**A.    DEFENDANTS' PONZI-LIKE SCHEME**

33.    The conspirators' plan was to use other people's money to acquire and operate new oil-rich real properties from which Sands' companies could keep the profits.  But investors with the amounts of money needed to fund these sorts of ventures are skeptical of new, unproven oil and gas investments. Defendants had limited access to investment capital and their existing oil properties were beset with problems.

34.    To solve these problems and prop up their poor revenues, Sands and his co-conspirators lied to investors—like Molori—about what oil leases they actually owned and how well those leases were performing. It was a type of Ponzi scheme. As Sands pocketed Molori's money, he made convoluted excuses for why the promised revenues had not materialized, and offered extravagant promises of even bigger profits for Molori just over the horizon. Undergirding it all, Sands constantly reminded Molori that if it stopped participating, it would lose the whole opportunity.

35.    Sands, his co-conspirators, and aiders never intended to give Molori either the oil and gas properties or the revenue it paid for. They pledged Molori's assets as collateral for illegally-obtained bank loans and used the loan proceeds for themselves. And whatever profits the properties generated disappeared into the co-conspirators' pockets as operating fees and inter-company transfer payments.

36.    Specifically, Richard Sands, his co-conspirators, and aiders swallowed up more than $2.6 million of Molori's money—and borrowed an additional $9.6 million using Molori's assets as collateral—yet never once paid Molori its proportionate working interest and net revenue interest nor any cash proceeds from the loans. As further detailed below, at the outset of the relationship, Sands,  his co-conspirators, and aiders committed non-stop wrongdoing:

        a.    misused a portion of Molori's $1.5 million initial investment to acquire the 2016 Leases (defined below), they falsely told Molori they owned instead of funding operations on already owned properties;

b.      diverted at least $200,000 of Molori's initial investment to another Sands-owned company—defendant Casimir—instead of using it as working capital;

c.      defrauded Molori out of an additional $1.0 million for interests in the GS Leases (defined below) that Sands had already pledged to a VPP finance company in exchange for a $2.1 million loan (described below);

d.      pledged Molori's interest in the 2016 Leases—excluding the State and Thompson Leases—for additional VPP financing of $2.51 million (described below); and

e.      misappropriated $100,000 that Molori sent in escrow for operations at the Thompson #23 well (described below).

37.      It took Molori significant time and work to discover and untangle Defendants' scheme. Below, we explain how Defendants did it.

**B.    DEFENDANTS' CORPORATE STRUCTURE AND RELATIONSHIPS**

38.      The attached Exhibit A summarizes the corporate Defendants' relationships.

39.      In 2016, Richard Sands served as the managing member of Casimir, RNP, LRG, GS Energy, PTO, and Ponderosa Energy.

40.      Adams Sands is Richard Sands' nephew and "right hand man." He also served as controller of other Sands-owned entities, including Ponderosa Energy and LRG.

41.      William Poon is a long-time and trusted employee and confidant of Richard Sands and the CFO of Casimir, a Sands-owned company to which Molori's investment funds were wrongfully diverted.

42.      Yaron Benchlouch is a financial analyst and employee of Casimir.

43.      Cory Meadows is Richard Sand's field foreman who ran the oil and gas operations in Texas.

C.    THE "2016 LEASES": DEFENDANTS CONVINCED MOLORI TO PURCHASE OIL AND GAS INTERESTS BASED ON FALSE INFORMATION.

*Spring 2016: Defendants Promoted Oil and Gas Investments to Molori Based on False Pretenses.*

44.    In early 2016, Richard Sands and his companies began marketing what they falsely called "Low Risk Conventional Oil and Gas Development[s]" in the Texas Panhandle through Casimir.

45.    Sands' companies did own certain mineral leases in the Panhandle and made those part of the 2016 marketing campaign.

46.    But Sands did not own, even indirectly, three extremely valuable mineral leases located in and along the Canadian Riverbed in Hutchinson County.  He also did not own two leases called the Thompson Leases, located in Moore County.

47.    Molori was a good target investor for Richard Sands and Casimir because Molori had significant funds to invest, experience in the oil business, and familiarity with oil properties in the Texas Panhandle. Molori was also a prime target because its personnel were located in Canada, far from the actual oil fields.

48.    On March 4, 2016, Richard Sands emailed Molori's  (then Taipan) CEO, Joel Dumaresq, to promote oil and gas leases in Hutchinson County as excellent investments.  Sands touted the proven reserves and historical production figures, writing:

> [at] closing, we will also have $50mm plus in proven reserves, 100 boepd [barrels of oil equivalent per day] production, 250 well bores. . .We will target 500 boepd at year end.. 15 wells per month. 3boepd/well.. 405 boepd plus the 100 we are starting with.

49.    These figures would have been attractive to many investors including Molori.

50.    On March 8, 2016, Richard Sands again emailed Joel Dumaresq and Theo Van Der Linde, Molori's CFO, to tell them production was "significant" and to press them to invest quickly, saying the developments would produce:

> 300 plus bbl [barrels] per day. *closing april 15th. any chance we can get some deposit money* ... we are buying these bbls at less than 15k per flowing bbl.

(emphasis added).  Molori later discovered these production figures were false.

51.     On March 10, 2016, Richard Sands continued his solicitation campaign by adding more false information in an email to Dumaresq and Van Der Linde:

> Less than 10k per flowing bbl.. 250k for 30 boepd now. . . . I have another client in the area doing 10k boepd .. he is being offered $100mm financing to acquire these kinds of things. I am trying to get this to 1k [1000 barrels] per day and flip it.

52.     The same day, Richard Sands emailed Dumaresq and Van Der Linde to promise a "once in a lifetime opportunity" for them to "flip [the proposed investment leases] in 18 months for 25mm [million dollars]–50 mm [million dollars]."

53.     On March 11, 2016, Richard Sands added more false inducements in an email to Dumaresq.  In addition to promising a huge "flip" value in a year, Sands now promised immediate profits and cash flow.  Sands wrote, "Lets do this as a working interest.. if we can… quicker, cleaner. *Taipan will get monthly cash flow right away.*" (emphasis added).

54.     Molori did its due diligence. It asked for Richard Sands' production and reserve data and reviewed what Sands provided.

**May 2016: Molori Invests $1.5 Million in the State Leases.**

55.     Relying on Sands' and his companies' false statements, Molori agreed to invest $1.5 million in approximately fifty oil and gas leases (collectively, the "2016 Leases") in Hutchinson and Moore Counties. The 2016 Leases included three of the extremely valuable "State Leases" located in the Canadian Riverbed and two additional leases called the Thompson Leases located in Moore County.

56.     Molori wired the $1.5 million to Richard Sands and William Poon in two separate wires on May 6 and 27, 2016, using wiring instructions provided by Poon on or around March 4, 2016.

57.     On May 6, 2016, Richard Sands caused Ponderosa Energy to convey to Molori both a 25% working interest and a 25% net revenue interest in the State Leases (the "First 25% Conveyance"):

> [a] twenty-five percent (25%) undivided Working Interest as to all depths of the [State Leases] . . . . along with a proportionate 25% Net Revenue Interest.

Richard Sands signed the conveyance as Ponderosa Energy's "Managing Member."

58.     Under Texas law, working interests and net revenue interests are real property.

59.     On June 2, 2016, Ponderosa Energy executed and delivered a Deed of Assignment of Working Interest ("Assignment") memorializing the First 25% Conveyance on May 6 to Molori. Richard Sands signed the Assignment on Ponderosa Energy's behalf.

60.     Molori later recorded the Assignment in the County Clerk Records of Hutchinson County. A true and correct copy of the Memorandum of Working Interest Assignment is attached as Exhibit B.

61.     Richard Sands later confirmed to a third-party auditor that Molori had acquired the described interests.  On February 22, 2017, Richard Sands sent a letter, which he signed as Ponderosa Energy's "Managing Member," to Molori's auditor confirming that:

> [d]uring the year ended October 31, 2016, Molori Energy Inc. ("Molori") acquired a 25% working interest from Ponderosa Energy in the oil and gas leases in [the 2016 Leases]."

**Richard Sands and Ponderosa Energy Did Not Own the State Leases When They Sold the Interests under the First 25% Conveyance to Molori.**

62.     Throughout their many sales communications with Molori, Richard Sands and Adam Sands repeatedly told Molori that Richard Sands' company, Ponderosa Energy, owned the State Leases. That was not true.

63.     In fact, Richard Sands and Ponderosa Energy needed Molori's $1.5 million to acquire the State Leases. Put another way, they sold Molori what they did not yet have.

64.     Accordingly, Richard Sands' signed conveyance of the State Leases to Molori on May 6, 2016, was false on its face.

65.     Instead, Richard Sands used Molori's money to acquire the State Leases after the fact.

66.     Molori would not have paid any amount—let alone $1.5 million—to Ponderosa Energy if it had known Ponderosa Energy did not already own the State Leases.

67.     To be clear, through the after acquired title doctrine and other laws, Molori in fact became the legal and equitable owner of the purchased interests when Defendants later obtained the State Leases. The interest under the First 25% Conveyance in the after-acquired State Leases immediately vested in Molori as a matter of law.[7] Moreover, as a matter of contract, the Deed specifically included after-acquired interests:

> Assignor [PE] expressly intends that this Assignment convey any title that Assignor may hereafter acquire to the extent that such after acquired title may be necessary to fulfill the interests herein assigned.

68.     Although Molori eventually received the interests under the First 25% Conveyance, it would not have bought real property interests from parties who did not have them to sell in the first place. Defendants' lies about owning the State Leases foreshadowed even greater fraud to come.

**D.     RICHARD SANDS LEECHES MOLORI'S OPERATING CONTRIBUTIONS TO MAKE SELF-DEALING DISTRIBUTIONS.**

*Overview of Joint Operating Agreements, Working Interests, and Net Revenue Interests*

69.     In the oil and gas business, a Joint Operating Agreement ("JOA") establishes the relationship between one or more working interest owners (explained below) and an operator. The

---

[7] *Houston First Am. Sav. v. Musick*, 650 S.W.2d 764, 770 (Tex. 1983) ("The rule is that when one conveys land by warranty of title, or in such a manner as to be estopped to dispute the title of his grantee, a title subsequently acquired to that land will pass eo instante to his warrantee, binding both the warrantor and his heirs and subsequent purchasers from either.").

JOA governs the operations, such as exploration, drilling, and production activities on the oil leases covered by the JOA. Each working interest owner is liable for its proportionate share of the reasonable and prudent expenses and the operator's fee. The operator distributes to each working interest owner its share of oil and gas revenues.

70.     The working interest owners select the operator, often from among the group of working interest owners or their affiliates.

71.     "Working interests" differ from "net revenue interests" in material ways. Revenues from an oil lease typically need to be paid, in order, to: (i) the state for taxes and fees; (ii) royalty owners such as fee simple landowners who reserve a percentage of the oil proceeds for themselves when they lease the mineral rights to developers; (iii) net revenue interest holders who receive a portion of the gross  revenues without having to pay operating costs; and (iv) working interest holders who share all of the development costs and split up the remaining revenues proportionally.

72.     To illustrate, Oilcorp might acquire a 100% working interest in Drillacre where royalty owners reserved a 12% royalty in Drillacre.  The 100% working interest is therefore entitled to only 88% of the revenue, net of taxes.  Thus, the 100% working interest holder would pay 100% of operating costs and keep only 88% of the revenue.

73.     Continuing the example, Oilcorp might divide its working interest into four portions, keeping one for itself and selling the other three to investors. Each investor would have a 25% liability to pay operating expenses in return for 22% of the net revenues (88% divided four ways). Oilcorp might also decide to sell one-third of its 22% net revenue interest to an investor to raise cash or for other value. The acquiring investor would receive a property interest in 7.33% of the net revenues, with no coordinate obligation to fund operations. Oilcorp would have to fund 25% of operations, but would now receive only 14.67% of net revenue.

*2016 Operations: PTO Operates the Oil Leases—But Diverts Molori's Working Interest Investment to Casimir For Richard Sands' Benefit.*

74.     In connection with Molori's investment in the 2016 Leases, Ponderosa Energy and Molori entered into a JOA on May 16, 2016.[8]

75.     The JOA selected another Richard Sands-owned entity called PTO (formally known as Ponderosa Operating) to act as operator for the 2016 Leases, including the State Leases and Thompson Leases.

76.     Section D.4 of the JOA established a fiduciary relationship between PTO and Molori. In particular, the JOA charged PTO with fiduciary responsibility for the custody of funds it received from non-operating investors like Molori, and for production revenues payable to them—that is, all of the investment money and production revenue at issue in this case.  The JOA provided:

> 4. Custody of Funds: Operator [PTO] shall hold for the account of the Non-Operators [i.e. Molori] any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B….

77.     The JOA expressly established PTO's duty to hold funds "for the account" of Molori as a fiduciary duty. Section D.4 continues:

> Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose ***other than* to account for Non-Operator funds as herein specifically provided.** Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

(emphasis added).

---

[8] A true and correct copy of the Joint Operating Agreement is attached as **Exhibit C**. The effective date of the Joint Operating Agreement was April 30, 2016.

78.     Richard Sands proposed and the parties agreed to use the AAPL Form 610-1989 Model Form Operating Agreement for the JOA. The 1989 model form reflected an official reformation to the AAPL 610-1977 Model Form Operating Agreement, which adopted new language that narrowed an operator's duty. But, at the same time, the 1989 model form at issue in this case preserved from this narrowing the two most critical areas of operator conduct—the operator's handling of investor money and production—leaving the fiduciary duty intact in these core areas.

79.     The JOA also required PTO to provide accountings to Molori of actual revenues and expenses. Specifically, Section V.D.5 of the JOA required PTO to provide Molori with full and complete access to its books and records, including all reports and information obtained in connection with production.

80.     Sands and PTO did not give Molori the required accountings.  Instead, Sands—aiding PTO's breach of fiduciary duty to Molori—falsely assured Molori that profits from the 2016 Leases, especially the State Leases, would be strong.

81.     For example, on June 3, 2016, Richard Sands emailed Dumaresq, Van Der Linde, and other Molori employees to report that "[t]his was a shortened month. . . but we did make revenue *and profit*." (emphasis added).

82.     On June 8, 2016, Richard Sands emailed Dumaresq and Van Der Linde false reports that "[c]osts [of operating] are coming in about 25% cheaper in many cases."

83.     Yet despite these assurances of profit, PTO and Richard Sands distributed no revenues to Molori for June 2016.

84.     It made no sense that PTO or others could have made profits on the 2016 Leases — as Richard Sands claimed on June 3, 2016—yet pay nothing to Molori.  Molori asked for an accounting from PTO as the JOA contemplated.

85.    PTO never provided a proper accounting or accounted for the funds it held on Molori's behalf, which constituted a breach its fiduciary duty to Molori.

86.    Instead, a month later on July 19, 2016, William Poon sent Derrick May at Molori a copy of PTO's general ledger. When Molori examined the ledger, it discovered PTO and Richard Sands had not been using Molori's investment to fund operations on the 2016 Leases and State Leases as the JOA required. Instead, PTO, in breach of its fiduciary duty to Molori, and Richard Sands, aiding PTO's breach of fiduciary duty, had inexplicably diverted at least $200,000 of Molori's initial investment to Casimir, a registered securities broker-dealer owned by Richard Sands.

87.    No provision of the JOA permitted Sands or PTO to make payments to Casimir, nor was Casimir providing PTO with goods or services to support the oil and gas operations.

88.    On July 21, 2016, Dumaresq emailed Richard Sands to put him on notice that Ponderosa Energy and PTO had violated the JOA:

> By my calculation, over $200,000 in JV funds [investment contributions] have been remitted to Casimir since the closing of the JV less than two months ago.
>
> …[T]here is no provision for such payments….
>
> According to the formal "AFE", I am putting Ponderosa on notice that it its Taipan's [Molori's] position that Ponderosa [is] in contravention of the terms of the JOA.

89.    Sands responded to Dumaresq several hours later, "…I assure you that you are misreading your calculations."

90.    But despite Richard Sands' claim Molori was "misreading" the numbers, he and PTO once again distributed no revenues to Molori for July 2016.

### Sands Conceals His Fraud and Theft from Molori By Controlling PTO's Accounting Records.

91.    Molori's threat to default PTO presented a serious problem for Richard Sands and his co-conspirators. First, PTO, having breached its fiduciary duty to Molori, could not account for its

self-dealing and improper transfer to Casimir. Second, PTO and Richard Sands also could not allow Molori to discover they used Molori's money to acquire the very leases they had sold to Molori under false pretenses.

92.     For the next six months, Richard Sands and PTO continued to ignore Molori's contractual demand for an accounting.

93.     In substitute, Richard and Adam Sands sent Molori "raw" production numbers that omitted expense details. PTO sent these unhelpful and obfuscating figures to Dumaresq and Van Der Linde at Molori in (at least) emails dated August 17 and November 23, 2016 (sent by Richard), and January 2, 2017 (sent by Adam).

94.     None of these emails or figures included the critically important information Molori requested about how PTO and Richard Sands were using Molori's investment or the revenue payable to Molori's working and net revenue interests.

95.     Meanwhile, PTO and Richard Sands once again distributed no revenues to Molori for August, September, November, or December 2016. While PTO did distribute $37,000 to Molori in October 2016, as addressed below, that amount turned out to be a fraction of the amount owed.

96.     By January 9, 2017, pressure from Molori had increased to the point that Richard Sands realized he simply had to send Molori *some kind* of accounting, even if he could not disclose the truth about how he had used Molori's investment money.

97.     Accordingly, Richard Sands emailed Dumaresq and Van Der Linde on January 9, 2017, with what Sands called an "effort at an LOS [lease operating statement]." Richard Sands' operating statement still was not a complete accounting as the JOA required. Yet even so, it purported to show that expenses ($888,849.23) eclipsed oil revenue ($381,295.17) by more than double.

98.     Richard Sands nonetheless assured Molori in his purported operating statement that "excluding capex, *we make good money*" (emphasis added). That may have been true for Richard Sands and his co-conspirators but not for their victim, Molori.

99.     Molori did its best to understand Richard Sands' oddly-presented data, not yet understanding it was being manipulated. Molori CEO Dumaresq thought that by being patient and not insisting on standard formats he was supporting Sands' good faith effort to operate the leases.

100.     Over the next five days from January 9 to 13, 2017, Molori's Van Der Linde twice emailed Adam and Richard Sands to request a "clear capital and operational summary" in a "proper Oil and Gas reporting format" that would satisfy Molori's auditors.

101.     Richard Sands responded in an email dated January 13, 2017, that he was keeping "overhead extremely low by [sic] doing [the accounting] in house" and that the format he provided should satisfy Molori's auditors.

102.     In reality, Richard Sands was doing the accounting "in house" because his illegal investment scheme would never stand up to professional scrutiny.

103.     Thus, Van Der Linde at Molori was forced to take the "raw" and piecemeal data Molori had received from Richard and Adam Sands, and create an accounting for Ponderosa Energy and PTO based on what Molori knew.

104.     Although the information from Richard and Adam Sands was woefully lacking, Van Der Linde was still able to reach some key conclusions. In a February 15, 2017, email to Richard and Adam Sands and Yaron Benchlouch, Van Der Linde reported his findings for the period covering June through December 2016.  Even Richard and Adam Sands' intentionally poor data showed that:

    a.     Gross oil sales reflected a price of $27 per barrel [which was inconsistent with the actual the price of oil during that period: $48-$50 per barrel];

    b.     While oil production remained consistent during the entire period, expenses more than doubled from $60,000 per month

between June and October to $137,000 in November and December; and

c.     Molori's proportionate revenue for June – October was $82,511, but Molori received only a single distribution of $37,000.

105.    On information and belief, PTO violated its fiduciary duty to Molori by making multiple distributions to Ponderosa Energy and others during this period, despite making only a single miniscule distribution to Molori.

**E.     RICHARD SANDS DISGUISES THE PONZI SCHEME WITH AN ATTRACTIVE OFFER TO SELL MOLORI A 25% WORKING INTEREST IN THE GS LEASES.**

*Spring 2017: Richard Sands and Adam Sands Sell Molori $1 Million Of Interests in the "GS Leases" As Part Of Their Purported Overall Development Strategy.*

106.    The challenge in all Ponzi-like schemes is to keep additional money flowing into the scheme so that the schemers can maintain the illusion of profitable operations while diverting investment money to themselves. Here, Richard Sands and his co-conspirators had pilfered so much of Molori's investment and revenue that they needed additional cash to make it appear they were on a profitable course. They also needed to distract Molori from its examination of Defendants' operations on the 2016 Leases.

107.    Thus, in early February 2017, while Molori's Van Der Linde was still working through PTO's and the Sands' disorganized production data for the 2016 Leases, Richard Sands offered Molori new hope for realizing near-term profits by adding new oil leases to the leases in which Molori had already invested.

108.    On February 6, 2017 (seven days before Van Der Linde would complete his review of PTO's data regarding the 2016 Leases), Richard Sands directed Adam Sands to attempt to entice Molori by emailing Molori's Van Der Linde and Dumaresq an oil reserves report that gratuitously included GS Energy. The unexpected inclusion had its intended effect and prompted Van Der Linde to respond, "Who is GS Energy?"

109.    Adam Sands replied to Van Der Linde:

> GS Energy are the leases that we are putting together that we are
> going to vend into Ponderosa and selling a 25% working interest
> to Molori.

110.    Molori would later learn that Richard Sands owned and controlled GS Energy. RNP directly owned GS Energy; Richard Sands owned RNP.

111.    Later that day, Richard Sands emailed Van Der Linde and Dumaresq a draft purchase and sale agreement to "give Molori 25% of the [GS] leases in that reserve report."

112.    Molori initially did not agree to acquire the 25% interest in the GS Leases. Nevertheless, Richard and Adam Sands continued to include rosy production reports for the GS Leases each time they reported the status of Molori's investments.

113.    Richard Sands used the apparent success of the GS Leases to deflect Molori's criticisms of PTO's unjustifiable expenses and low returns on the State Leases. For example, in an email dated April 3, 2017, Theo Van Der Linde of Molori expressed concern to Richard Sands that Ponderosa Energy had barely broken even during the previous three months. Van Der Linde highlighted his concern about the "[s]ignificant increase" in general and administrative expenses for "[s]alaries & [w]age and [c]onsulting fees"—i.e. the fees Richard Sands kept for himself and his companies. Van Der Linde concluded, "[y]ou can see why there seems to be a 'cash crunch.' Revenues simply don't cover expenses."

114.    Richard Sands falsely claimed the increase reflected expenses of adding the purportedly successful GS Leases to the overall portfolio. In his email response later that day, Richard Sands responded to Van Der Linde:

> *This will look unbelievable next quarter with gs production* very little
> increase in expenses.. together with the drop off in capex."

(emphasis added).

115.    From Molori's vantage point, the rosy GS Lease production figures helped to explain why profits had not materialized on the proven 2016 Leases. In addition, Molori saw opportunity in the GS Leases themselves.

116.    Accordingly, Molori purchased the 25% working interest in the GS Leases that Adam Sands and Richard Sands had offered.  Molori sent the $1.0 million purchase price to Richard Sands in four separate wires on May 5, 12, 19, and 29, 2017.

***Again, Richard Sands Did Not Own the Working Interests He Sold Molori; He Had Previously Leveraged Them in Exchange for $2.1 Million in VPP Financing.***

117.    Molori did not know when it wired $1 million to Richard Sands in May 2017 that Richard Sands did not have a 25% working interest in the GS Leases to sell.

118.    In 2016, Richard Sands began negotiating a financing arrangement to obtain even more capital and used his company, GS Energy, to purchase the GS Leases on credit extended by Petroleum Production Finance, Inc. ("PPFI"). In that transaction, Richard Sands pledged the GS Leases and working interests to PPFI as collateral for a $2.1 million payment to GS Energy.

119.    The PPFI loan took the form of so-called "volumetric production payments," also called "VPP financing."

120.    In VPP financing arrangements the borrower repays the lender with an agreed monthly quota of the oil (or other hydrocarbons) produced from the pledged properties. The quota is expressed in quantities of barrels of oil, not dollars. This structure shifts the market risks to the VPP lender (e.g. the future price of oil, costs of storage, transportation charges) but leaves the production risks with the borrow (e.g. the size of reserves, difficulties in production).

121.    In the deal between Molori, GS Energy, and Ponderosa Energy for the GS Leases, Richard Sands caused GS Energy to pledge a quota of the total oil production, thereby burdening the 25% working interest he purported to sell Molori.  Put another way—instead of receiving 25% of all

oil revenues produced on the GS Leases (net of taxes and royalties), Molori received 25% of revenues *for oil produced in excess of the VPP quota.*

122.    Worse, Richard Sands had given PPFI a first lien on the entirety of the GS Leases, which included the working interest he later sold to Molori. Richard Sands, with help from his co-conspirators and aiders, breached the warranty of title by selling Molori something that was not his to sell—a first lien on the property Molori purchased.

123.    Had Molori known that the GS Leases were encumbered, it would not have agreed to invest additional funds with Richard Sands.

**Richard Sands Leveraged Most of the 2016 Leases for an Additional $2.5 Million in VPP Financing and Transferred the State and Thompson Leases out of Ponderosa Energy**

124.    At the same time that he was negotiating with PPFI for VPP financing that covered the GS Leases, Richard Sands was trying to leverage the 2016 Leases—except the State and Thompson Leases—to obtain additional VPP financing.

125.    In late 2016 or early 2017, Richard Sands leveraged these leases in exchange for a $2.51 million payment from PPFI. As with the GS Leases, he conveyed a first lien priority on these leases—including Molori's interest—and pledged a portion of production.

126.    Once again, Molori did not agree to encumber its property and certainly never received any benefit from the funds Richard Sands obtained from PPFI using Molori's property as collateral.

127.    Further, on May 25, 2017, Molori discovered that, several months prior, Richard Sands had, without Molori's knowledge or consent, transferred the State and Thompson Leases away from Ponderosa Energy and into another Sands-owned entity, Ponderosa State Energy, LLC ("Ponderosa State").

128.    What Molori did not know at the time was that Richard Sands had taken this defensive action in order to shield the valuable State and Thompson Leases from the clutches of his creditors.

**F.      SUMMER 2017: MOLORI CONTRIBUTES $100,000 TO WORK OVER THE THOMPSON #23 WELL—WHICH RICHARD SANDS STEALS.**

129.      By May 2017, Molori wanted to increase oil production from some of the 2016 Leases. Molori could not then have known Richard Sands was siphoning off Molori's investment and revenues—and that this was the real reason Molori had not received its share of distributions from the 2016 Leases.

130.      Molori told Richard Sands and Yaron Benchlouch that it was sending $100,000 to fund operations to turn on the inactive Thompson #23 well.  The Thompson #23 well was part of the 2016 Leases.

131.      On May 5, 2017, Benchlouch, conspiring with Richard Sands, received a $100,000 wire transfer from Molori.  Benchlouch and Richard Sands represented to Molori that they would use the money to work over and turn on the Thompson #23 well.

132.      On the same day, Benchlouch assured Molori he would hold Molori's $100,000 in escrow until the Thompson #23 well was actually turned on.

133.      Richard Sands and his co-conspirators never did the work Molori requested.  They did not turn on the Thompson #23 well.

134.      On August 18, 2017, a full three months after receiving the $100,000 wire from Molori, Richard Sands again assured Dumaresq that the funds would be used for the Thompson well. Again, this did not occur.

135.      On November 27, 2017, Dumaresq emailed Richard Sands, Adam Sands, and Yaron Benchlouch and asked for the return of  Molori's escrowed $100,000. Molori wanted to use the funds itself to turn on Thompson #23—a right owned by a working interest owner under the JOA.

136.      On November 28, 2017, Adam Sands responded, "I spoke with Richard about the $100k and he said that it will 100% go directly to drilling the small Thompson well."  Still it did not.

137.     On December 5, 2017, Dumaresq emailed Benchlouch to reiterate Molori intended to drill the Thompson #23 well itself.  Dumaresq wrote,

> I require the return of the $100,000. . . As you will recall, *you assured me the money would be kept segregated and that it would be returned to us* in the event we did not proceed with the frac.  It's critical in terms of our plans and timing that I hear back from you and Adam and that you confirm that commitment will be honoured.

(emphasis added).

138.     On December 7, 2017, Benchlouch responded only to direct Dumaresq to speak with Richard and Adam Sands. Neither of them turned on the Thompson #23 well or returned the escrowed money.

139.     In hindsight, the reason Richard Sands, Adam Sands, and Benchlouch were so reticent was that they had used Molori's money, not for oil operations on the 2016 Leases or Thompson #23, but to fund further acquisitions for Sands' other companies such as LRG which, as described below, acquired assets from Legacy Reserves, L.P. Clearly, they needed to keep Molori ignorant of those uses in order to avoid discovery.

## G.     RICHARD SANDS PERJURES HIMSELF IN ORDER TO BORROW $5.0 MILLION USING MOLORI'S INTERESTS AS COLLATERAL.

140.     By the autumn of 2017, the ponzi scheme had swallowed up more than $2.6 million of Molori's money—and borrowed an additional $4.5 million from PPFI using Molori's assets as collateral—yet never once paid Molori its proportionate working interest and net revenue share or proceeds from the loans. Indeed, Sands and his co-conspirators had:

  a.     misused a portion of Molori's $1.5 million initial investment to acquire the 2016 Leases they falsely told Molori they owned instead of funding operations;

  b.     diverted at least $200,000 of Molori's initial investment to another Sands-owned company called Casimir;

  c.     defrauded Molori out of an additional $1.0 million for interests in the GS Leases that Sands had already pledged to for $2.1 million in VPP financing;

   d.  pledged Molori's interest in the 2016 Leases—excluding the State and Thompson Leases—for additional VPP financing of $2.51 million; and

   e.  misappropriated $100,000 that Molori sent in escrow for operations at the Thompson #23 well.

141. All ponzi schemes rely on ever-increasing revenues to keep going, but now even more financial trouble pressured Sands and the other Defendants. Sands needed to get creative if he were to keep the bubble from bursting.

**Richard Sands' Legal Problem:  A Texas State Court Impedes His Schemes.**

142. In 2017, several third parties added Ponderosa Energy as a defendant in a title action pending in Hutchinson County, Texas ("Hutchinson County Litigation"). The Hutchinson County Litigation included claims concerning the rightful ownership and boundaries of the State Leases.  The State Leases were included in the 2016 Leases, in which Molori owned the First 25% Conveyance

143. On October 6, 2017, the court in the Hutchinson County Litigation appointed a special master to oversee the finances and operation of the State Leases during the litigation.  The court's special master appointment also prevented the parties from drilling additional wells on the State Leases.

144. Ponderosa Energy and the other Hutchinson County Litigation parties had also previously agreed Ponderosa Energy would not obtain a loan mortgaging any portion of the State Leases or their proceeds without the Texas court's approval.

145. The net effect of the Hutchinson County Litigation was to keep Richard Sands from being able to operate the State Leases in the dark and siphon off royalty and other revenue.  In order to borrow money against the State Leases, Richard Sands would have had to tell the Texas court about Molori's 25% working and net interests. Richard Sands knew that if he revealed Molori's interests, the other parties would have involved Molori in the legal action and Molori would have soon discovered Defendants' misappropriations.

*Richard Sands' Illegal Solution:  Lie Under Oath.*

146.    Molori had a direct interest in the Hutchinson County Litigation and should have been included as a party in interest.

147.    Neither Richard Sands nor any of his co-conspirators (or any other person) informed Molori:

        a.    that the Hutchinson County Litigation existed;

        b.    that it concerned Molori's real property interests;

        c.    that Ponderosa Energy was a defendant and actively litigating; or

        d.    that a special master now controlled operations and revenue distributions, including Molori's 25% working and net revenue interests in the State Leases.

148.    Importantly, Richard Sands also hid Molori's interest from the Texas court.

149.    On June 22, 2017, with Molori still ignorant of the Hutchinson County Litigation, Richard Sands and Ponderosa Energy asked the Texas court for permission to apply for a $5,000,000 line of credit encumbering the State Leases and their proceeds.

150.    Ponderosa Energy supported its request by representing to the Texas court that it wanted the loan "to properly develop and preserve the [State] leases in question," and that "[t]he loan will not harm or impair any rights of the parties to this lawsuit" because it "will be subject to whatever claims are being made against the leases."

151.    On July 12, 2017, the Texas court conducted an evidentiary hearing to determine whether to approve Ponderosa Energy's request to apply for a loan.

152.    At that hearing, counsel for one of the parties asked Richard Sands about Molori. Counsel had seen an internet reference to Molori's investments in the Texas panhandle with Richard Sands. Richard Sands falsely testified under oath that Molori had no interest whatsoever in the State Leases. Specifically:

Q.   Now, has any other entity put any money into Ponderosa-State Energy or any of the Ponderosa defendants to acquire an interest in any of these State Leases.?

A.   I'm sorry.  Ponderosa-State owns these leases, okay?  I own Ponderosa-State.

Q.   Right.

A.   That's it.

Q.   Okay.  So nobody else put any money in except you?

A.   That's right.

**Q.   Are you familiar with a group named Molori Energy, Inc.?**

**A.   Yes, I am.**

Q.   And how is it you're familiar with them?

A.   It's a – it's a company that I have raised money for in the past, and I have raised money for – for various entities.

**Q.   Do they have any interest in any of these wells or any of the leases that are in controversy in this lawsuit?**

**A.**   They have an interest in Ponderosa Energy, which is my other company.  They have a specific interest in Ponderosa.  **In the State Leases, no.**

Q.   The State Leases, no?

A.   They have no direct interest in Ponderosa-State.

Q.   Do they have an interest, directly or indirectly, in Ponderosa-State or in the leases and wells that are involved in this litigation?

A.   They're an investor of mine in another entity.

**Q.**   That's not my question, sir**.  I'm questioning whether they have any investment in any of the wells or any of the leases that are in issue in this lawsuit.  It's a simple yes or no.**

**A.**   I have to think.  **They don't have a direct or indirect investment in any of these leases.**

(emphasis added).

153.     On July 17, 2017, based on Richard Sands' false testimony, the Texas court conditionally approved a $5,000,000 revolving line of credit from Washington Federal Bank to Ponderosa State

154.     With court authority in hand, Richard Sands obtained the loan from Washington Federal Bank—ostensibly committing bank fraud—by falsely representing to Washington Federal Bank that Ponderosa State owned the entire working interest in the State Leases, leaving out the fact that he had sold the First 25% Conveyance to Molori a year earlier.

155.     Because Richard Sands lied to the court and to Washington Federal Bank about Molori's interest in the State Leases, Molori was not a party to the loan.

156.     Had Molori been aware of Richard Sand's representations to the court, it would not have agreed to leverage its assets.

157.     Ponderosa State obtained the proceeds from the Washington Federal Bank loan on or about July 13, 2017, and Washington Federal Bank thereafter recorded a Deed of Trust and Security Agreement as Doc. 00365459 in Hutchinson County, Texas. Accordingly, Washington Federal Bank now asserts a first position lien that improperly includes Molori's interests in the State Leases—a right that neither Ponderosa State nor Richard Sands had  legal ability to give.

## H.     RICHARD SANDS DEFRAUDS MOLORI INTO "TRADING" ITS ASSETS

158.     By October 2017, Richard Sands had fallen behind on the VPP financing payments for the GS Leases and 2016 Leases (excluding the State and Thompson Leases).  PPFI was threatening foreclosure, and Richard Sands was, yet again, trying to make a deal.

159.     In order to avoid a planned November foreclosure sale and continue to negotiate with PPFI, Richard Sands had to get Molori out of the way. He needed to prove to PPFI that he held a 100% interest in the VPP-financed leases and had the power to make a deal.

160.     So, Richard Sands offered Molori an asset swap.  In an email dated October 31, 2017, Richard Sands asked Dumaresq to sign an affidavit disavowing Molori's interest in the GS Leases and the 2016 Leases (excluding the State and Thompson Leases). In exchange, he proposed to transfer an additional 25% working interest in the State Leases to Molori, which would increase  Molori's working interest to 50%, in addition to the 25% net revenue interest.

161.     Specifically, Richard Sands wrote that Molori would gain "another 25% of the good [State] leases.  Your reserves will go up."  In turn, he would "jettison off [his] back" PPFI and the less valuable leases, while retaining the "good leases," *i.e.*, the State and Thompson Leases,  then held in Ponderosa State, at "very little cost."

162.     Of course, Richard Sands' October 31, 2017, email offering "another 25%" in the State Leases demonstrates that he knew he was lying to the Texas court three months earlier when he denied that Molori had any direct or indirect interest *at all* in the State Leases.

163.     Notably, Richard Sands did not bother to tell Molori that the State Leases were under the special master's control in the Hutchinson County Litigation.

164.     Molori accepted Richard's offer.  Van Der Linde executed an affidavit disavowing Molori's interest in the VPP-financed GS Leases and 2016 Leases on November 2, 2017 ("Molori Affidavit").  The Molori Affidavit was to be held in escrow by Cory Meadows and PTO until the parties had exchanged assets and Molori authorized the release of the Molori Affidavit.

165.     Despite accepting delivery of the Molori Affidavit into escrow, Richard Sands refused to document the transfer to Molori of an additional 25% working interest in the State Leases.

I.     **PONDEROSA ENERGY FRAUDULENTLY TRANSFERS THE STATE AND THOMPSON LEASES TO AN INSIDER AND MISLEADS A BANKRUPTCY COURT.**

166.     As described above, in late 2016, Richard Sands transferred both the State and Thompson Leases into other Sands-owned and controlled entities, DND Oil, Inc., and BTX Production, Inc., both of which then transferred the respective interests into Ponderosa State.

167.    At the time of this transfer, Richard Sands manifested an actual intent to defraud Ponderosa Energy's creditors based on the presence of several "badges of fraud"—including continuing control over the State Leases.

168.    Richard Sands retained control of the State Leases and Thompson Leases through Ponderosa State.

169.    Unable to strike a deal with PPFI that would avoid foreclosure of the VPP financed leases, Richard caused Ponderosa Energy to file bankruptcy in the Southern District of New York on December 5, 2017.

170.    In an email to Dumaresq the same day, Richard Sands attempted to excuse his duplicity by stating that "[w]e were the subject of [a] usurious fraudulent loan. and [sic] will likely get it all" in the bankruptcy case.

171.    But in a sworn declaration signed January 9, 2018, Richard Sands lied to the bankruptcy court by failing to disclose, as required by law, his defensive transfers of the State and Thompson Leases from Ponderosa Energy to Ponderosa State less than two years prior.

172.    Additionally—just as he had lied to the court in the Hutchinson County Litigation regarding Molori's interest in the State Leases in order to obtain the Washington Federal Bank loan— Richard Sands misrepresented Molori's interest in the VPP financed leases from the bankruptcy court.

173.    Specifically, Richard Sands and Ponderosa Energy consummated a bankruptcy settlement by presenting the Molori Affidavit to the court without performing their obligations to Molori—*i.e.*, without assigning and transferring the additional interest in the State Leases to Molori.

174.    Richard Sands produced the Molori Affidavit to the bankruptcy court knowing that he did not have Molori's permission to do so and lied to the court about ownership of the VPP financed leases.

175.    Molori appeared in the Ponderosa Energy bankruptcy on July 31, 2018 to defend its property rights.

176.    Molori also intervened in the Hutchinson County Litigation on July 5, 2018 asserting claims for specific performance and to quiet title to the State Leases.  The Hutchinson County Litigation has been stayed since October 2017 pending an unrelated appeal by the State of Texas.

177.    On September 9, 2019, Richard Sands caused Ponderosa State—including Molori's interest in the State Leases—to file for bankruptcy.

## J.    RICHARD SANDS USES MOLORI'S INVESTMENT AND REVENUE TO PURCHASE LEGACY RESERVES, LP

178.    In October 2017, Richard pitched another investment opportunity to Molori focusing on mineral assets formerly owned by Legacy Reserves, LP or its affiliates and sought several million dollars in additional funds to purchase the assets.

179.    On December 15, 2017, Richard Sands again sought Molori's investment in LRG—the company that purchased the Legacy Reserve assets—sending Dumaresq an email containing a PowerPoint presentation:

> Here is our new venture.  Total purchase price is 28mm [million dollars].  we already have 16mm rbl [reserve-based lending] and *4mm [million dollars] equity*.  We need another 10 mm.  let me know your thoughts on it.  if any.  It is a 1k boepd producer now.

(emphasis added).

180.    In other words, just ten days after Richard Sands caused Ponderosa Energy to file for bankruptcy, he represented to Molori that he had more than $4 million in equity devoted to LRG. This, after accepting $2.6 million of Molori's money on behalf of Ponderosa Energy over the previous 18 months, all of which seemingly disappeared along with Molori's profits.

181.    Richard Sands used funds looted from Molori's investments, including (a) the funds Molori provided for the GS Leases; (b) the funds Molori provided to turn on Thompson #23; and (c)

the proceeds from the Washington Federal Bank loan, to purchase Legacy Reserves LP.  He placed

those assets in LRG on February 6, 2018.

182.    Accordingly, Richard Sands and LRG have been unjustly enriched by receipt of

Molori's money and hold the Legacy Reserves assets in a constructive trust for Molori, whose assets

they misappropriated to purchase the Legacy assets.[9]  Molori seeks conveyance of title to the Legacy

assets—and any other properties which Defendants purchased with Molori's funds—to Molori

## K.    RICHARD SANDS DEFRAUDED MOLORI WITH THE AID OF HIS CO-CONSPIRATORS.

### *Richard Sands*

183.    Richard Sands marketed and sold Molori interests in oil and gas leases through his

various companies, including Ponderosa Energy and Casimir, and promised millions of dollars in

returns—including monthly cash flow.

184.    Instead, he took Molori's money and funneled them through his many companies,

including Casimir, Ponderosa Energy, GS Energy, RNP, and LRG, and purchased the assets he had

already "sold" to Molori on credit.  Specifically:

a.    Sands fraudulently induced Molori to invest $1.5 million in the 2016
Leases, without revealing to Molori that its investment money would be
used, in part, to acquire the leases or to pay "consulting fees" to other
Sands-owned companies, including Casimir;

b.    Sands fraudulently induced Molori into investing $1.0 million in the GS
Leases, without revealing that they were already leveraged to PFFI, which

---

[9] Under Texas law, constructive trust is not a cause of action.  *Clapper v. Am. Realty Inv'rs, Inc.,* No. 3:14-CV-2970-D, 2016 WL 302313, at *14 (N.D. Tex. Jan. 25, 2016) (quoting *In re Moore,* 608 F.3d 253, 263 (5th Cir. 2010)).  It is an equitable remedy used to prevent unjust enrichment.  *Id.*  "In order to establish a constructive trust, the proponent must prove: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and, (3) tracing to an identifiable res." *Id.*  Funds sought to be held in a constructive trust must be clearly traced to specific property, without conjecture.  *In re Marriage of Harrison,* 310 S.W.3d 209, 213 (Tex. App.—Amarillo 2010); *see also Wilz v. Flournoy,* 228 S.W.3d 674, 676 (Tex. 2007).  However, "when the trustee, the wrongdoer, mingles the trust funds with his own property or invests it in such a manner that the trust funds can no longer be separated or identified" the tracing element is relaxed.  *Id.* "The *Wilz* opinion states that, once the burden of tracing has been met, the entire property will be treated as subject to the trust, except insofar as the trustee can distinguish and separate that which is his own."  *Id.* (citing *Wilz,* 228 S.W.3d at 676).

ultimately cost Sands (and Molori by extension) the GS Leases in bankruptcy; and

c.   Sands fraudulently induced Molori to pay an additional $100,000 in order to turn on Thompson #23, which he kept without making any effort to turn on the well.

185.   He further transferred Molori's assets among his companies in an effort to strip Molori of its interests.

186.   When he was unable to meet his financing obligations, he placed the companies that owned the assets in bankruptcy.

187.   In so doing, he lost Molori's interest in the assets, while maintaining the funds Molori's invested and earned.

**Adam Sands**

188.   Adam Sands is Richard's "right hand man" and nephew.

189.   Adam actively participated in the fraudulent sale of oil and gas leases by preparing and communicating misleading accounting documents and information, financial projections, and other materials for Richard's companies, including Ponderosa Energy.

190.   Adam knew the information was false and that the false information would be used to entice Molori to invest in the oil and gas securities.

191.   Adam also knew that Molori would rely on the information that he provided.

**William Poon**

192.   William Poon is the CFO of Casimir, and a long-time and trusted employee and confidant of Sands who was aware of all of Sand's illicit or illegal acts.

193.   William Poon knowingly oversaw the fraudulent transfer of fraudulently obtained funds between the various Sands-owned companies in New York and Texas, including the fraudulent transfers to Casimir.

194.   He also provided misleading accounting information to Molori.

*Yaron Benchlouch*

195.    Yaron Benchlouch is a financial analyst and employee of Casimir.

196.    He built the PowerPoint "pitch" presentations and vetted news releases for Molori which he knew to be incorrect.

197.    Specifically, Benchlouch had direct knowledge of what Sands was doing behind the scenes with the Ponderosa Energy's assets.

198.    Benchlouch assured Molori that he would hold from Richard Sands, a $100,000 payment that Molori made to Ponderosa Energy until such time that a well was worked over and turned on with respect to the Thompson Leases.

199.    Benchlouch however failed to meet his promise and turned the money over to Sands, and thus it was lost to Molori without the well ever being worked over and turned on..

*Cory Meadows*

200.    Cory Meadows was Richard Sand's field foreman who ran the operations on the State Leases.

201.    Meadows actively participated in concealing PTO's operating profits and production information from Molori and knowingly delivered the Molori Affidavit to Richard Sands instead of holding it in escrow.

*Casimir Capital, L.P.*

202.    Casimir is Richard Sands' registered broker dealer entity, which he used to market fraudulent investment opportunities and through which he laundered fraudulently obtained funds.

203.    Specifically, Casimir received hundreds of thousands of dollars that belonged to Molori through fraudulent transfers among and instigated by Richard Sands and Casimir's employee, William Poon.

*RNP*

204.     RNP is a company owned by Richard Sands through which millions of fraudulently obtained dollars were funneled, including purchasing the Legacy assets using Molori's money.

*LRG*

205.     When Sands recognized that his actions had imperiled Ponderosa Energy to the point where the assets had questionable value (by making unauthorized loans, failed hedges on the production volumes and by unauthorized transfers of capital and assets out of Ponderosa Energy to either Casimir or RNP), he formed LRG to continue his efforts in Texas.

206.     Sands used some of Ponderosa Energy's capital (supplied by Molori) in the formation of LRG and in its initial acquisition phase to purchase the Legacy Reserves assets.

## L.     THE DAMAGE DONE

207.     At minimum, Richard Sands and his co-conspirators and his aiders caused damages to Molori of $6.7 Million, consisting of the money Molori paid to the Defendants, the oil and gas revenue Defendants failed to pay to Molori, and Molori's proportionate share of the Washington Federal Bank Loan and the VPP financing loans.

208.     But in addition to these damages, Richard Sands and his co-conspirators and his aiders cost Molori the value and use of its property over time, which Richard Sands himself estimated to be at least $25 million.

209.     Molori seeks these damages plus any punitive, exemplary, and other damages to which it is entitled, including attorneys' fees and costs.

## CLAIMS

### Count One
### Money Had and Received and Constructive Trust (All Defendants)

210.     Molori repeats and realleges each of the allegations made above and incorporates them herein.

211.     Defendants hold money which belongs to Molori.

212.     Specifically, Molori paid money to Ponderosa Energy intended for PTO under the JOA. Ponderosa Energy wrongfully distributed that money to the other Defendants, including Casimir, RNP, and LRG, without providing any consideration to Molori.

213.     The Defendants received millions of dollars in loan proceeds and oil and gas revenues attributable to Molori's assets.

214.     This money, in equity and good conscience, belongs to Molori.

215.     Molori has been damaged by Defendants' conduct, including the millions of dollars in stolen money, wrongfully procured loans and oil and gas revenues over the past four years.

216.     As discussed below, PTO breached its fiduciary duty to Molori, aided by the other Defendants.  Accordingly, Molori has met its burden for a constructive trust and asks the Court to (a) impose a constructive trust over the assets of LRG, Casimir, and RNP, and the other individuals and entities that have been unjustly enriched by Molori's funds; (b) convey title to the Legacy Reserves LP assets held in LRG to Molori; and (c) convey title to any other properties purchased with Molori's money to Molori.

### Count Two
### Breach of Fiduciary Duty (PTO)

217.     Molori repeats and realleges each of the allegations made above and incorporates them herein.

218.    As the operator under the JOA. PTO owed a contractual and legal fiduciary duty to Molori, as an owner of oil and gas leases and party to the JOA.

219.    Under the JOA and applicable law, PTO has a fiduciary duty to hold funds advanced by or payble to Molori on Molori's account until such funds are used for their intended purpose or otherwise paid to Molori.

220.    PTO also has a fiduciary duty to provide accurate accountings to Molori under the JOA and applicable law.

221.    PTO breached its duties by, among other things, misappropriating fiduciary funds, failing to use Molori's invested funds for operations and to remit the millions of dollars in net revenue and working interest proceeds payable to Molori.

222.    PTO further breached its duty to Molori by, among other things, refusing to provide Molori with true and accurate accountings of funds used in and earned.

223.    PTO further breached its fiduciary duty to Molori by accepting Molori's $100,000 payment to turn on Thompson #23 and misappropriating the funds without working over and turning it on.

224.    Molori has suffered injury and damages as a result of PTO's breach of its fiduciary duty to Molori, including the millions of dollars in stolen money, wrongfully procured loans and oil and gas revenues.

### Count Three
### *Aiding and Abetting Breach of Fiduciary Duty (All Defendants Except PTO)*

225.    Molori repeats and realleges each of the allegations made above and incorporates them herein.

226.    PTO breached its fiduciary duty to Molori, which was documented, *inter alia*, in the JOA..

---

227.     Richard Sands, Adam Sands, Meadows, Benchlouch, Poon, RNP, Casimir, LRG, and Ponderosa Energy knew of the fiduciary relationship between PTO and Molori.  Without limitation: Richard Sands signed the JOA and knew about the fiduciary relationship. Adam Sands, Meadows, Benchlouch, and Poon knew about PTO's fiduciary duty to Molori because each assisted Sands with the daily operations under the JOA—the operative document in the day-to-day relationship and one of the most common, promulgated documents in the oil and gas industry. Given the closely held nature of the entity Defendants—RNP, LRG, and Casimir—knowledge held by Richard Sands is imputed.

228.     Each Defendant is part of Sands' web of entities through which Molori's investment funds and revenue were funneled and wrongfully appropriated.

229.     Each party had knowledge and awareness of his, her, or its participation in PTO's breach of its fiduciary duty to Molori and the misappropriation of fiduciary funds.

230.     As detailed above, each Defendant took action to further PTO's breach.

231.     Molori suffered injury and damages as a result of each Defendants' actions.

### Count Four
### Civil Conspiracy (All Defendants)

232.     Molori repeats and realleges each of the allegations made above and incorporates them herein.

233.     Richard Sands, Adam Sands, Meadows, Benchlouch, Poon, RNP, Casimir, LRG, and PTO set about to accomplish the goal of defrauding Molori and stealing over $2.5 million and virtually all of the production revenues to which Molori was entitled.

234.     Richard Sands, Adam Sands, Meadows, Benchlouch, Poon, RNP, Casimir LRG, and PTO reached a meeting of the minds on a course of action to defraud Molori and steal from it.

235.     As discussed above, each Defendant took unlawful, overt steps to accomplish the common goal.

236.     Molori suffered injury and damages as a result of the defendants' actions.

**Count Five**
**Fraud in the Inducement:  2016 Leases**
**(Richard Sands, Adam Sands, Poon, Benchlouch, PTO and Casimir)**

237.     Molori repeats and realleges each of the allegations made above and incorporates them herein.

238.     Richard Sands, Adam Sands, William Poon, Yaron Benchlouch, PTO, and Casimir made multiple material representations to Molori that were false about the 2016 Leases.

239.     Specifically, these Defendants falsely represented to Molori that Richard Sands and Ponderosa Energy owned the 2016 Leases, when in fact Richard Sands  would use Molori's funds, in part, to purchase these leases.

240.     Further, these Defendants falsely represented that Molori's investments would be used to fund the operation of the 2016 Leases, when they actually used Molori's funds to purchase the assets or to make distributions to Sands-owned companies.

241.     Further, these Defendants supplied Molori with false accounting documents that misrepresented the financial affairs of Ponderosa Energy and PTO.

242.     These Defendants knew these representations were false and intended to induce Molori to act upon the representations by investing $1.5 million in the 2016 Leases.

243.     Molori, unaware of the misrepresentations, actually and justifiably relied upon them and thereby suffered injury, including the loss of over $1.5 million.

**Count Six**
**Fraud in the Inducement:  GS Leases**
**(Richard Sands, Adam Sands, Poon, Benchlouch, PTO, and Casimir)**

244.     Molori repeats and realleges each of the allegations made above and incorporates them herein.

245.     Richard Sands, Adam Sands, William Poon, Yaron Benchlouch PTO, and Casimir made multiple material representations to Molori that were false about the GS Leases.

246.     Specifically, these Defendants falsely represented to Molori that Richard Sands—and companies owned by Richard Sands—owned the GS Leases in which he sought investment from Molori, when in fact, they were already leveraged to PFFI.

247.     Further, these Defendants falsely represented that Molori's investments would be used to fund the operation of the GS Leases, when they actually used Molori's funds to purchase other assets or to make distributions to Sands-owned companies.

248.     Further, these Defendants supplied Molori with false accounting documents and lied about illicit transfers of Molori's funds.

249.     Richard Sands, Adam Sands, William Poon, GS Energy, Ponderosa Energy and Casimir knew these representations were false.

250.     Richard Sands, Adam Sands, William Poon, GS Energy, Ponderosa Energy, and Casimir intended to induce Molori to act upon the representations by investing more than $1.0 million.

251.     Molori, unaware of the misrepresentations, actually and justifiably relied upon them and thereby suffered injury, including the loss of over $1.0 million.

### Count Seven
### Fraud in the Inducement:  Thompson #23
### (Richard Sands, Adam Sands, Poon, Benchlouch, PTO)

252.     Molori repeats and realleges each of the allegations made above and incorporates them herein.

253.     Richard Sands, Adam Sands, William Poon, Yaron Benchlouch, and PTO made multiple material representations to Molori that were false about Thompson #23.

254.     Specifically, these Defendants represented to Molori that its $100,000 investment would be held in escrow and used to turn on the Thompson #23 well.

255.    These Defendants knew these representations were false and intended to induce Molori to act upon the representations by investing an additional $100,000.

256.    Molori, unaware of the misrepresentations, actually and justifiably relied upon them and thereby suffered injury, including the loss of $100,000

## Count Eight
### Aiding and Abetting Fraud:  2016 Leases
### (RNP, Cory Meadows, and LRG)

257.    Molori repeats and realleges each of the allegations made above and incorporates them herein.

258.    Richard Sands, Adam Sands, William Poon, Yaron Benchlouch, PTO, and Casimir defrauded Molori into spending $1.5 million for the 2016 Leases.

259.    RNP, Cory Meadows, and LRG had intent to assist the other Defendants in defrauding Molori into purchasing the 2016 Leases and gave them assistance or encouragement.

260.    These Defendants' conduct was a substantial factor in causing the fraud.

261.    Molori was injured and suffered damages including the millions of dollars in stolen money, wrongfully procured loans and oil and gas revenues over the past four years. as a result of their conduct.

## Count Nine
### Aiding and Abetting Fraud:  GS Leases
### (RNP, Cory Meadows, and LRG)

262.    Molori repeats and realleges each of the allegations made above and incorporates them herein.

263.    Richard Sands, Adam Sands, William Poon, Yaron Benchlouch, Ponderosa Energy, PTO, GS Energy, and Casimir defrauded Molori into spending $1.0 million for the GS Leases.

264.    RNP, Cory Meadows, and LRG had intent to assist the other Defendants in defrauding Molori into purchasing the 2016 Leases and gave them assistance or encouragement.

265.     These Defendants' conduct was a substantial factor in causing the fraud.

266.     Molori was injured and suffered damages in the amount of at least $1.0 million as a result of their conduct.

### Count Ten
### Aiding and Abetting Fraud:  Thompson #23
### (RNP, Cory Meadows, and LRG)

267.     Molori repeats and realleges each of the allegations made above and incorporates them herein.

268.     Richard Sands, Adam Sands, William Poon, Yaron Benchlouch, PTO, and Casimir defrauded Molori into spending $100,000 to turn on Thompson #23.

269.     RNP, Cory Meadows, and LRG had intent to assist the other Defendants in defrauding Molori into spending $100,000 allegedly to turn on Thompson #23 and gave them assistance or encouragement.

270.     These Defendants' conduct was a substantial factor in causing the fraud.

271.     Molori was injured and suffered damages in the amount of at least $100,000 as a result of their conduct.

### Count Eleven
### Fraud in a Real Estate Transaction:  2016 Leases
### (Richard Sands, Adam Sands, Poon, Benchlouch, PTO, Casimir)

272.     Molori repeats and realleges each of the allegations made above and incorporates them herein.

273.     Richard Sands, Adam Sands, Poon, Benchlouch, PTO, and Casimir made a material misrepresentation of fact to Molori regarding the purchase of the 2016 Leases when they represented that Richard and/or Ponderosa Energy owned the leases and that Molori's money would be used to operate the wells and generate profits.

274.     These misrepresentations were made for the purpose of inducing Molori into entering into a contract and investing in the leases and with the intention of not fulfilling the promises.

275.     Molori relied on these representations in entering into a contract and investing in the 2016 Leases.

276.     Molori suffered damages as a result of these parties' conduct, including actual damages, reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court.

## Count Twelve
### Fraud in a Real Estate Transaction:  GS Leases
### (Richard Sands, Adam Sands, Poon, Benchlouch, PTO, Casimir)

277.     Molori repeats and realleges each of the allegations made above and incorporates them herein.

278.     Richard Sands, Adam Sands, Poon, Benchlouch, PTO, and Casimir made a material misrepresentation of fact to Molori regarding the purchase of the GS Leases when they represented that Richard and/or Ponderosa Energy owned the leases and that Molori's money would be used to operate the wells and generate profits.

279.     These misrepresentations were made for the purpose of inducing Molori into entering into a contract and investing in the leases and with the intention of not fulfilling the promises.

280.     Molori relied on these representations in entering into a contract and investing in the GS Leases.

281.     Molori suffered damages as a result of these parties' conduct, including actual damages, reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court.

## Count Thirteen
### Seller Liability under Section 33 of Texas Securities Act:  2016 Leases
### (Casimir and Richard Sands)

282.    Molori repeats and realleges each of the allegations made above and incorporates them herein.

283.    The 2016 Leases constitute a "security" under the Texas Security Act.

284.    A person who offers or sells a security by means of an untrue statement of a material fact or an omission is liable to the person or entity buying the security.

285.    Richard Sands and Casimir marketed and offered the 2016 Leases to Molori by means of the untrue statements and omissions of material facts described herein.

286.    Molori suffered harm and damages as a result of their conduct and is entitled to actual damages, including the amounts paid for the security plus interest thereon, as provided by the TSA.

### Count Fourteen
### Control Person Liability under Section 33 of Texas Securities Act: 2016 Leases
### (Richard Sands)

287.    Molori repeats and realleges each of the allegations made above and incorporates them herein.

288.    The 2016 Leases constitute a "security" under the Texas Security Act.

289.    Richard Sands directly controlled Ponderosa Energy, which sold the 2016 Leases to Molori by means of the untrue statements and omissions of material facts described herein at all relevant times.

290.    Further, Richards Sands had full knowledge of and controlled the transactions between Molori and Ponderosa Energy, including the misrepresentations on which Molori relied in purchasing the securities.

291.    Molori suffered harm and damages as a result of their conduct and is entitled to actual damages, including the amounts paid for the security plus interest thereon, as provided by the TSA.

### Count Fifteen
### Seller Liability under Section 33 of Texas Securities Act: GS Leases
### (Richard Sands)

292.     Molori repeats and realleges each of the allegations made above and incorporates them herein.

293.     The interests in the GS Leases constitute a "security" under the Texas Security Act.

294.     A person who offers or sells a security by means of an untrue statement of a material fact or an omission is liable to the person or entity buying the security.

295.     Richard Sands violated the TSA by offering and selling the above-described security by means of the untrue statements and omissions of material facts described herein.

296.     Molori suffered harm and damages as a result of their conduct and is entitled to actual damages, including the amounts paid for the security plus interest thereon, as provided by the TSA.

## Count Sixteen
### Control Person Liability under Section 33 of Texas Securities Act: GS Leases
### (Richard Sands)

297.     Molori repeats and realleges each of the allegations made above and incorporates them herein.

298.     The interests in the GS Leases constitute a "security" under the Texas Security Act.

299.     Richard Sands directly controlled Ponderosa Energy, which sold the GS Leases to Molori by means of the untrue statements and omissions of material facts described herein, at all relevant times.

300.     Further, Richards Sands had full knowledge of and controlled the transactions between Molori and Ponderosa Energy, including the misrepresentations on which Molori relied in purchasing the securities.

301.     Molori suffered harm and damages as a result of their conduct and is entitled to actual damages, including the amounts paid for the security plus interest thereon, as provided by the TSA.

## Count Seventeen
### Aiding and Abetting liability under Section 33 of the Texas Securities Act: 2016 Leases
### (All Defendants Except Richard Sands and Casimir)

302.     Molori repeats and realleges each of the allegations made above and incorporates them herein.

303.     A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

304.     Richard Sands and Casimir committed primary violations of the Texas Securities Act by offering and selling securities to Molori by means of the untrue statements and omissions of material facts described herein.

305.     The remaining Defendants materially aided Casimir and Richard Sands in facilitating the transactions by misrepresenting material facts to Molori in order to induce Molori into purchasing the securities.

306.     The remaining Defendants had general awareness of their role in Casimir's and Richard Sands' violations of the Texas Securities Act.

307.     The remaining Defendants acted with intent to deceive Molori or with reckless disregard for the truth.

308.     The remaining Defendants rendered assistance in the face of a perceived risk that their assistance would facilitate untruthful or illegal activity by Richard Sands and Casimir.

309.     Molori suffered damages as a result of these parties' actions and is entitled to actual damages, including the amounts paid for the security plus interest thereon, as provided by the TSA.

***Count Eighteen***
***Aiding and Abetting Violation of Section 33 of the Texas Securities Act: GS Leases***
***(All Defendants Except Richard Sands)***

310.     Molori repeats and realleges each of the allegations made above and incorporates them herein.

311.     A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

312.     Richard Sands committed primary violations of the Texas Securities Act by offering and selling securities to Molori by means of the untrue statements and omissions of material facts described herein.

313.     The remaining Defendants materially aided Richard Sands in facilitating the transactions by misrepresenting material facts to Molori in order to induce Molori into purchasing the securities.

314.     The remaining Defendants had general awareness of their role in Richard Sands' violations of the Texas Securities Act.

315.     The remaining Defendants acted with intent to deceive Molori or with reckless disregard for the truth.

316.     The remaining Defendants rendered assistance in the face of a perceived risk that their assistance would facilitate untruthful or illegal activity by Richard Sands.

317.     Molori suffered damages as a result of these parties' actions and is entitled to actual damages, including the amounts paid for the security plus interest thereon, as provided by the TSA.

***Count Nineteen***
***Alter Ego***
***(Richard Sands)***

318.    Molori repeats and realleges each of the allegations made above and incorporates them herein.

319.    Richard Sands owns Casimir and LRG, each corporate citizens of Delaware.

320.    Richard Sands wholly failed to observe the corporate formalities of Casimir and LRG such that Casimir and LRG are the alter egos of Richard Sands.

321.    Specifically, Casimir, LRG, and Richard Sands share a unity of ownership and interest and lack sufficient corporate separateness and formalities. As described above, Richard Sands regularly made self-dealing and non-arm's-length transfers among the entities he controlled, including Casimir, and LRG, among others.

322.    Casimir and LRG are nothing more than façades for Richard Sands, which he used to perpetuate fraud on others, including Molori.

323.    Richard Sands fraudulently siphoned funds from Casimir and LRG to the detriment of creditors such as Molori.

324.    Observing the corporate separateness of Casimir, LRG, and Richard Sands would lead to injustice and unfairness to Molori, which has been damaged by their actions.

### Count Twenty
### Simple and Gross Negligence
### (All Defendants)

325.    Molori repeats and realleges each of the allegations made above and incorporates them herein.

326.    Each Defendant's conduct involved an extreme degree of risk considering the probability and magnitude of the potential harm to Molori

327.    Each Defendant had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifferences to Molori's rights.

328.    Specifically, the individual Defendants in this lawsuit recklessly transferred funds belonging to Molori among the corporate Defendants without regard to Molori's right to the funds and/or to dictate the use of those funds.

329.    Further, each Defendant made reckless representations to Molori and both sold property to and out from under Molori, without regard to Molori's rights.

330.    Each Defendant knew of the high degree of probability that these actions would cause harm to Molori and deprive Molori of its property, but nevertheless persisted with the conduct.

331.    Molori has been damaged by the Defendants actions and is entitled to actual and punitive damages from the Defendants.

PRAYER

For these reasons, Molori asks the court to grant judgment against all defendants, jointly and severally, for statutory, compensatory, punitive, exemplary, and actual damages, pre- and post-judgment interest, attorneys' fees, costs of suit, conveyance title of the Legacy Reserves LP assets held in LRG to Molori, conveyance of  title to any other properties purchased with Molori's money to Molori, constructive trust in an amount to be proven at trial, including the millions of dollars in stolen money, wrongfully procured loans and oil and gas revenues over the past four years, and such other and further relief to which Molori may be justly entitled.

Respectfully Submitted,

**JOHNSTON CLEM GIFFORD PLLC**

By: /s/ Robert W. Gifford
    **Kenneth C. Johnston**
    State Bar No. 00792608
    kjohnston@johnstonclem.com

    **Robert W. Gifford**
    State Bar No. 24093543
    rgifford@johnstonclem.com

    **Catherine E. (Kate) Gaither**
    State Bar No. 24059793
    kgaither@johnstonclem.com

1717 Main Street, Suite 3000
Dallas, Texas 75201
(214) 974-8000 Main
(972) 474-1750 Facsimile

***Attorneys for Molori Energy, Inc.***